Tomas **MUNOZ**, Plaintiff,

v.

**WESTERN RESOURCES, INC.,** Defendant.

No. 00–4105–JAR.

United States District Court, D. Kansas.

Sept. 26, 2002.

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

ROBINSON, District Judge.

This matter is before the Court on Western Resources, Inc.'s motion for summary judgment against Plaintiff, Tomas Munoz (Doc. 28). Munoz brought suit against his former employer, Western Resources, Inc. ("Western Resources"), under Title VII of the Civil Rights Act of 1964[1] ("Title VII") and the Kansas Act Against Discrimination[2] ("KAAD") claiming disparate treatment on the basis of his national origin, hostile work environment and constructive discharge. He also claims Western Resources violated the Americans with Disabilities Act ("ADA")[3] by failing to accommodate his disability. As set forth in detail below, Western Resource's motion for summary judgment is granted as to Munoz's disparate treatment, constructive discharge and ADA claims; and denied as to Munoz's hostile work environment claim.

## I. Standards for Summary Judgment.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[4] The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[5] Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submis-

Steven M. Tilton, Tilton & Tilton, Topeka, KS, for Plantiff.

D. Brad Bailey, Office of U.S. Atty., Topeka, KS, for Defendant.

1. 42 U.S.C. § 2000e et seq.

2. Kan.Stat.Ann. §§ 44–1001 et seq.

3. 42 U.S.C. § 12101 et seq.

4. Fed.R.Civ.P. 56(c).

5. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

sion to a jury or whether it is so one-sided that one party must prevail as a matter of law." [6]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This may be met by showing that there is a lack of evidence to support the nonmoving party's case.[7] Once the moving party properly supports its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial.[8] "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." [9] Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.[10] The court must consider the record in the light most favorable to the nonmoving party.[11]

Summary judgments "should seldom be used in employment discrimination cases." [12] Because discrimination claims often turn on the employer's intent, courts ordinarily consider summary judgment in-appropriate to settle an issue like intent.[13] Even so, summary judgment is not "per se improper," [14] and may be useful in weeding out claims and cases obviously lacking in merit.[15]

## II. Facts.

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in the light most favorable to Munoz's case. Immaterial facts and facts not properly supported by the record are omitted.

Munoz is a naturalized citizen of the United States who was born in Mexico in 1940. Western Resources operates the Jeffrey Energy Center ("JEC") where Munoz worked from February 15, 1988 to March 1, 2000. Munoz last worked as an Auxiliary Equipment Operator/Control Room Operator in Training for JEC.

On April 22, 1999, Munoz called JEC to report a medical absence. He went to a doctor's appointment that morning, and his doctor said he could return to work the next day. Later that day a co-worker saw him at a restaurant owned by Munoz's wife and reported Munoz was "working" at the restaurant. JEC suspended Munoz for thirty days because working at another

**6.** *Id.* at 251–52, 106 S.Ct. 2505.

**7.** *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**8.** *See Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

**9.** *Id.*

**10.** *See id.*

**11.** *See Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985).

**12.** *O'Shea v. Yellow Technology Services, Inc.,* 185 F.3d 1093, 1098 (10th Cir.1999) (quoting

*Smith v. St. Louis University,* 109 F.3d 1261, 1264 (8th Cir.1997)).

**13.** *Cone v. Longmont United Hosp. Ass'n.,* 14 F.3d 526, 530 (10th Cir.1994); *see Courtney v. Biosound, Inc.,* 42 F.3d 414, 418 (7th Cir. 1994) ("[T]he summary judgment standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." (quotation and citation omitted)).

**14.** *Washington v. Lake County, Ill.,* 969 F.2d 250, 253 (7th Cir.1992).

**15.** *Summers v. State Farm Mut. Auto. Ins. Co.,* 864 F.2d 700, 709 (10th Cir.1988), *overruled on other grounds, McKennon v. Nashville Ban-*

business on a sick day violated the company leave policy.

In 1996 JEC had suspended a Caucasian employee for working on his farm while taking a sick day. That employee had a history of abusing the sick leave policy. JEC used different penalties and different lengths of suspension to punish employees who violated company policy.

Munoz received negative performance evaluations in 1996 and 1999. He did not file an administrative claim within 300 days of his 1996 evaluation. In 1999 his supervisor rated Munoz low in safety. The supervisor assigned Munoz corrective training and Munoz successfully completed that training. When assigned to a position as a Control Room Operator Trainee, Munoz asked for training materials in Spanish. His supervisor tried, but could not locate any Munoz had completed prior training in English.

Munoz perceived racial tension in his work environment at JEC. Other employees socialized in the supervisor's office during midnight shifts. When Munoz entered the office, his supervisor responded with comments like "what do you want" which made Munoz feel unwelcome. Munoz's supervisor knew that employees used the word "Mexican" in the work place referring to ethnic identity. Derogatory use of this word referring to ethnic origin violated company policy, yet Munoz's coworker "joked" that he would call immigration and have Munoz deported; and at least one of his supervisors laughed at these comments. Finally, Munoz claims that one of his supervisors consistently referred to all Mexicans as lazy. The supervisor denies making these comments. Munoz claims these comments made him feel "un-liked" and adversely affected his ability to do his job.

Munoz suffers from diabetes. In 1999, JEC temporarily placed Munoz on a non-rotating shift while waiting for his medical evaluation. In January 2000, Munoz's doctor sent a letter to JEC stating that his work schedule should be agreed upon between JEC and Munoz. The letter stated that "whatever shift he works, he must take his medication properly as well as plan his meals accordingly." Upon receiving that letter, JEC assigned Munoz to the same schedule as other employees, which included rotating day, evening and night shifts. Munoz felt that the rotating shifts endangered his health, and he volunteered for early retirement on April 1, 2000.

## III. Discussion.

Munoz's claims against his employer are for: (a) disparate treatment based on his national origin, (b) hostile work environment, (c) failure to accommodate a disability and (d) constructive discharge. Munoz claims that JEC discriminated against him under Title VII and the KAAD. Title VII and the KAAD are analogous. While not controlling, federal decisions applying Title VII are persuasive authority in KAAD claims.[16]

### A. Disparate treatment.

To show disparate treatment Munoz has the burden to prove that JEC intentionally discriminated against him.[17] Munoz offers no direct evidence of intentional discrimination. Therefore, the Court examines Munoz's claim of discrimination under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green.*[18] First, Munoz must establish a prima facie

---

*ner Pub. Co.,* 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).

**16.** *Best v. State Farm Mut. Auto. Ins. Co.,* 953 F.2d 1477, 1479 (10th Cir.1991).

**17.** *Munoz v. St. Mary–Corwin Hosp.,* 221 F.3d 1160, 1166 (10th Cir.2000).

**18.** 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

case. Once an employee shows a prima facie case, the burden shifts to the employer to demonstrate "some legitimate nondiscriminatory reason" for the adverse employment action.[19] If the employer offers a nondiscriminatory reason, the burden shifts back to the employee to show that the employer's reason was merely a pretext for discrimination. To show a pretext the employee must show that discrimination was the real reason for the adverse action.[20]

A prima facie case of disparate treatment has three elements. First, Munoz must show that he is a member of a protected class.[21] Second, Munoz must show that he suffered adverse employment action.[22] Third, Munoz must show that his employer treated similarly situated employees differently.[23]

Munoz is undisputedly an ethnic minority, satisfying the first part of his prima facie case. Munoz claims four types of adverse employment actions: (1) disproportionately low employment evaluations; (2) inadequate training in the control room; (3) failure to provide training materials in Spanish; and (4) thirty day suspension for violating the company sick leave policy.

**(1) Evaluations.**

Munoz claims that his October 1996 employee evaluation contained unjustifiably low marks. However, Munoz failed to exhaust his administrative remedies by filing this charge with the Equal Employment Opportunity Commission or the Kansas Human Rights Commission within 300 days of the alleged discrimination.[24] Because the complaint was untimely filed, summary judgment is proper with regards to the 1996 evaluation.[25]

■ Munoz also claims that his 1999 employee evaluation contained unjustifiedly low marks. Conduct qualifies as adverse employment action if it "constitutes a significant change in employment status."[26] The Tenth Circuit defines "adverse employment action" liberally.[27] Negative employment evaluations constitute adverse employment action if they have adverse effects on future employment.[28] Munoz's low evaluation resulted in retraining, but not any serious adverse action on future employment or loss of benefits. This poor rating without more serious consequences is not sufficient to show adverse action.

Moreover, Munoz offers no evidence that JEC treated similarly situated employees differently. Munoz fails to make out a prima facie case of disparate treatment based on his employment evaluations.

19. *Id.* at 802.

20. *Trujillo v. University of Colorado Health Sciences Ctr.,* 157 F.3d 1211, 1215 (10th Cir. 1998).

21. *Id.* at 1214

22. *Id.*

23. *Id.*

24. *See Bullington v. United Air Lines Inc.,* 186 F.3d 1301, 1310 (10th Cir.1999); 42 U.S.C. § 2000e–5(e).

25. *See id.*

26. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 744, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

27. *See Jeffries v. State of Kan.,* 147 F.3d 1220, 1232 (10th Cir.1998).

28. *See Toth v. Gates Rubber Co.,* 216 F.3d 1088 (10th Cir.2000).

### (2) Lack of Training Time in the Control Room.

■ Munoz claims that company policy entitled him to priority in control room training because he was the senior Control Room Trainee. He argues that other trainees received more training time than he did and that this lack of training constitutes adverse employment action. The Court will not consider this information because it was not raised in either the complaint or the pre-trial order. The Court does not consider information outside the pre-trial order.[29]

Assuming the issue was properly before the Court, Munoz has produced no evidence to establish a prima facie case of discrimination on this basis. Munoz has not offered any evidence that he suffered adverse employment actions as a result of the alleged discriminatory amount of training. Further, although Munoz testified that he believes that other employees were treated differently, he has produced no evidence that these other employees were Caucasian. Because Munoz has failed to produce any evidence supporting his prima facie case, summary judgment is appropriate on this claim.

### (3) Spanish Training Materials.

■ Munoz further claims that failure to provide Spanish training material constitutes adverse employment action. Munoz cites no statute or case law that would require JEC to provide training materials in Spanish, nor is this Court aware of any such requirements. Munoz also fails to establish how the lack of training materials adversely impacted him, since he had successfully completed earlier training in English. In fact, Munoz succeeded in his retraining at a quicker rate than was expected and outperformed most of the Caucasian employees undergoing retraining. Munoz fails to establish a prima facie case of disparate treatment in this regard.

### (4) Suspension for Abuse of Sick Leave.

■ Finally, Munoz claims that his thirty-day suspension for abuse of sick leave was disparate treatment. JEC does not contest that suspension was an adverse action for purposes of summary judgment. But, in order to avoid summary judgment, Munoz must show that he was treated differently than similarly situated non-minority employees. In considering whether similarly situated employees were treated differently, a court will look at employees who work with the same supervisor and are subject to the same standards governing discipline and performance evaluation. The court will look at work history, company policies and other relevant circumstances applicable to the plaintiff and the other employees alleged to be similarly situated to make its determination.[30]

Munoz relies on three pieces of evidence to show that JEC treated him differently than similarly situated non-minority employees. He compares his suspension with the less severe punishment received by other employees for drinking and shooting guns in the JEC parking lot. Munoz also compares his suspension to the punishment of a Caucasian employee whom JEC also suspended for violating the sick leave policy. Munoz and the other employee received the same punishment although the Caucasian employee had a history of abusing the sick leave policy and Munoz did not. Finally, Munoz generally relies on a JEC company policy that allowed him

---

**29.** *Gowan v. United States Dept. of Air Force,* 148 F.3d 1182, 1192 (10th Cir.), *cert. denied* 525 U.S. 1042, 119 S.Ct. 593, 142 L.Ed.2d 535 (1998).

**30.** *See Aramburu v. Boeing Co.,* 112 F.3d 1398, 1404 (10th Cir.1997).

to take the entire day of work if the doctor authorized it as a sick day.

Munoz's evidence does not indicate that JEC punished him more severely than other similarly situated employees.[31] Munoz compares his suspension to the punishment of employees caught drinking and shooting guns in the company parking lot. But drinking and shooting guns is not similar to abusing the company sick policy and is therefore not a valid comparison to show disparate treatment.

Although Munoz offers that a Caucasian employee with a worse record received the same punishment, he fails to show that he was treated more severely than someone like himself, with no history of violating the policy. This evidence shows that JEC treated Munoz the same as another employee who violated the same company policy although the other employee had a history of violating the policy. But, the evidence does not show that Munoz's punishment was harsher than any other employee who also violated the same policy. In fact, in addition to suspension, the Caucasian employee was required to sign an agreement with JEC indicating that any further abuse of sick leave would result in termination. Munoz was not required to sign a so-called "last chance" letter.

Finally, Munoz argues that company policy allowed Munoz to take the day off after a doctor authorized not returning to work after an appointment. However, to establish his prima facie case, Munoz needs to present evidence that the employer treated Munoz differently than similarly situated employees.[32] Munoz offers no evidence regarding similarly situated em-

ployees who were not punished for failure to return to work, or employees who supervisors saw working after doctors' appointments. Despite JEC's policy, other employees may have been treated the same as Munoz. Thus, Munoz fails to make a prima facie case of disparate treatment in this regard. Therefore, the Court grants summary judgment on the disparate treatment claim.

## B. Hostile Work Environment.

In order to survive summary judgment on a hostile work environment claim, Munoz must show that under the totality of the circumstances, the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment; and that the harassment was based on or stemmed from his Mexican ancestry or national origin.[33] In addition, Munoz must point to "more than a few isolated incidents of racial [or ethnic] enmity."[34]

■ Munoz offers the following evidence of harassment. First, co-workers used the term "Mexican" in the workplace in a derogatory manner and violated company policy. At least one supervisor knew that employees used the word. Munoz also claims that a supervisor consistently referred to Mexicans as liars. Another co-worker "joked" about having Munoz deported and at least one supervisor laughed at these comments. Munoz claims these comments adversely affected his ability to perform his job because he felt bad that his co-workers disliked him. Munoz also alleges that although other employees socialized in the supervisor's office during midnight shifts, the supervisor did not invite Munoz to do the same.

---

**31.** *Elmore v. Capstan, Inc.,* 58 F.3d 525, 529–30 (10th Cir.1995).

**32.** *See Trujillo,* 157 F.3d at 1214.

**33.** *Vigil v. City of Las Cruces,* 113 F.3d 1247, 1997 WL 265095 (10th Cir.1997) (citing *Bol-*

*den v. PRC Inc.* 43 F.3d 545, 551 (10th Cir. 1994)).

**34.** *Id.* (citing *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1412 (10th Cir.1987)).

JEC denies many of these claims and contends that in any event, none were frequent enough to be pervasive. However, for summary judgment purposes, the Court considers the totality of the circumstances viewed in the light most favorable to Munoz. The Court finds Munoz's testimony is enough evidence of a pervasively hostile work environment to survive summary judgment.

A hostile work environment is an environment that a reasonable person would find hostile and an environment that the employee subjectively perceives as abusive or hostile.[35] JEC claims that Munoz cannot show that he subjectively perceived the environment as hostile because Munoz stated that he ignored racist comments and that the insults did not hurt him. The Court finds that Munoz's statements defending himself against insults do not show that Munoz did not subjectively perceive a hostile environment. The comments have a defensive tone that indicates Munoz was protecting his pride. And, Munoz stated that he felt that nobody liked him and that influenced his ability to do his job. These comments indicate that Munoz perceived his environment as hostile. Viewing the circumstances in a light most favorable to Munoz, the Court finds that there is evidence that Munoz subjectively perceived his environment as hostile.

JEC argues that it is still entitled to summary judgment as a matter of law because there is no basis to hold the employer liable for the hostile work environment. An employer can be held liable for a hostile work environment created by the conduct of a supervisory employee if: (1) such conduct was within the scope of the supervisor's employment; (2) the employer knew or should have known about the hostile work environment and failed to respond in an appropriate way; or (3) under principles of vicarious liability.[36] A supervisor who, while at work, comments about Mexicans being liars, is acting in the scope of his employment. A supervisor who hears comments about deportation and laughs, or who participates in comments, inculpates the employer. These supervisors knew about the hostile work environment because they were involved in creating the environment. There is no evidence that the supervisors responded to the situation. Munoz presented evidence that his employer can be held liable for his hostile work environment because the conduct occurred in the scope of the employment and supervisors knew of the discrimination and failed to respond.

JEC could also be liable for its supervisors' actions under vicarious liability. The Supreme Court has held that an employer is vicariously liable for the misuse of supervisory authority that does not result in adverse employment action against the employee, subject to an affirmative defense that "(a) the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."[37] JEC does not raise or address either affirmative defense.

Viewing the factual record and all reasonable inferences in the light most favorable to Munoz and under the totality of the

---

**35.** *See Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 20–21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

**36.** *Wright– Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1270–71 (10th Cir.1998).

**37.** *Wilson,* 164 F.3d at 541 (quoting *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton,* 524 U.S., 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

circumstances, the Court finds that material issues of fact exist as to whether Munoz's environment at JEC was sufficiently severe or pervasive so as to alter the conditions of his employment and create a racially or ethnically hostile work environment. JEC's motion for summary judgment on this issue is denied.

## C. Failure to Accommodate under the ADA.

### (1) Qualified individual.

The ADA prohibits discrimination against a qualified individual with a disability because of the disability of such individual in regard to job application procedures; the hiring, advancement, or discharge of employees; employee compensation; job training; and other terms, conditions, and privileges of employment.[38] When considering a claim brought under the ADA, the court is once again guided by the *McDonnell Douglas* analytical framework.[39] The first step requires a plaintiff to establish a prima facie case by proving: (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe) he is able to perform the essential functions of the job; and (3) he suffered adverse employment action because of the disability.[40]

A person is considered to have an ADA disability if that individual (a) has a physical or mental impairment that substantial-ly limits one or more of the major life activities of such individual, (b) has a record of such an impairment, or (c) is regarded by the employer as having such an impairment.[41] Munoz claims he is disabled under subsection (a), and contends that JEC failed to provide him with reasonable accommodations for his alleged disability. Specifically, Munoz claims that JEC refused to place him on a fixed shift schedule necessary to control his diabetes.

A three-step process is used to determine whether an individual is disabled under subsection (a).[42] The court must first determine if a plaintiff suffers from a physical impairment.[43] Next, the court identifies the life activities affected by the impairment and determines whether they are major life activities under the ADA.[44] Finally, the court determines whether the impairment "substantially limits" the major life activities identified in the previous step.[45] It is uncontroverted that Munoz is diabetic and suffers from a physical impairment.

Although the ADA does not define the term "major life activities," subsequent regulation from the Equal Employment Opportunity Commission has given some guidance. These regulations adopt the definition of "major life activities" found in the Rehabilitation Act regulations. The term "means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."[46] The term has

**38.** 42 U.S.C. § 12112(a).

**39.** *See Williams v. Widnall,* 79 F.3d 1003, 1005 & n. 3 (10th Cir.1996) (explaining application of the analysis in cases under the ADA).

**40.** *White v. York Intern. Corp.,* 45 F.3d 357, 360–61 (10th Cir.1995).

**41.** 42 U.S.C. § 12102(2).

**42.** *See Poindexter v. Atchison, Topeka & Santa Fe Railway, Co.,* 168 F.3d 1228, 1230 (10th Cir.1999) (citing *Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998)).

**43.** *Id.*

**44.** *Id.*

**45.** *Id.*

**46.** 29 C.F.R. § 1630.2(i).

also been expanded by subsequent interpretation to include "sitting, standing, lifting, and reaching."[47] In determining whether a particular activity constitutes a "major life activity," the court must ask "whether that activity *is significant within the meaning of the ADA,* rather than whether that activity is important to that particular individual."[48]

■ "[A] plaintiff must articulate with precision, the impairment alleged and the major life activity affected by that impairment."[49] The court "is to analyze only the major life activity asserted by the plaintiff."[50] Munoz identifies the major life activity he claims has been limited by virtue of his physical disability as working. The Tenth Circuit has held that working is a major life activity under the ADA.[51]

Munoz must show that his impairment "substantially limits" his identified major life activities.[52] The term "substantially limits" means that Munoz is "(i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner, or duration under which he can perform a particular major life activity as compared to the condition, manner, or duration under

which the average person in the general population can perform that same major life activity."[53] Recent Supreme Court precedent defines "substantially limits" as "considerably" or "to a large degree."[54] In making the determination, the following factors should be considered: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment.[55] "[I]f a person is taking measures to correct, or mitigate, a physical or mental impairment, the effects of those measures—both positive and negative—must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the [ADA]."[56]

"[T]o demonstrate that an impairment 'substantially limits' the major life activity of working, an individual must show significant [ ] restrict[ion] in the ability to perform either a *class of jobs or a broad range of jobs in various classes* as compared to the average person having comparable training, skills and abilities."[57] "[T]he inability to perform a single, particular job does not constitute a substantial limitation on the major life activity of working."[58]

47. 29 C.F.R. Pt. 1630, Appendix to Part 1630—Interpretive Guidance to Title I of the ADA, § 1630.2(i); *see also, Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170 (10th Cir. 1996) (lifting is a major life activity.)

48. *Pack v. Kmart Corp.,* 166 F.3d 1300, 1305 (10th Cir.), *cert. denied* 528 U.S. 811, 120 S.Ct. 45, 145 L.Ed.2d 40 (1999) (emphasis added).

49. *Poindexter,* 168 F.3d at 1232.

50. *Doyal v. Oklahoma Heart, Inc.,* 213 F.3d 492, 496 (10th Cir.2000) (quoting *Poindexter,* 168 F.3d at 1231).

51. *Id.* at 495–96.

52. *Poindexter,* 168 F.3d at 1230.

53. 29 C.F.R. § 1630.2(j)(1).

54. *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).

55. *Lusk v. Ryder Integrated Logistics,* 238 F.3d 1237, 1240 (10th Cir.2001).

56. *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

57. *Bolton v. Scrivner, Inc.,* 36 F.3d 939, 942–43 (10th Cir.1994) (quoting 29 C.F.R. § 1630.2(j)(3)(i) (emphasis added)).

58. *Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 904 (10th Cir.1997) (quoting 29 C.F.R.

Viewing the evidence in the light most favorable to Munoz, the Court finds that he has failed to establish a genuine issue of material fact as to whether he was "disabled" within the meaning of the ADA. Munoz claims that his diabetes prevented him from working the rotating shift schedule. However, the letter from Munoz's doctor stated that his diabetes was under control and that he should take his medication and plan his meals in accordance with his work schedule. The doctor did not indicate that Munoz's diabetes limited his life activities. Further, even if his diabetes substantially limits his ability to work a rotating shift, Munoz offers no evidence that his diabetes substantially limits his ability to work in a class or broad range of jobs. Therefore, Munoz offers no evidence that he qualifies for protection under the ADA and the Court grants summary judgment on this claim.

## (2) Failure to reasonably accommodate

■ Assuming that Munoz suffered from a disability protected by the ADA, there is no evidence that JEC failed to reasonably accommodate his disability. Under the ADA, discrimination is defined to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." [59] The statute thus establishes a cause of action for disabled employees whose employers fail to reasonably accommodate them. [60] However, an employer is not required to always provide employee with the best possible accommodations or in the specific manner the employee requested. [61] It has broad discretion in determining which alternative accommodation should be provided. [62] Under the ADA, reasonable accommodations may include job restructuring, part-time or modified work schedules, reassignment to a vacant position, and other similar accommodations. [63]

In this case, Munoz claims that JEC failed to accommodate his disability by placing him on a fixed shift schedule rather than the normal rotating shift schedule where his hours were rotated every two weeks. Munoz's physician, Dr. Chavez, wrote JEC a letter stating:

> It appears that you have given [Munoz] all alternative options at the work place. I can suggest no further ideas. His diabetes is under control and can continue to be under control with medication, proper diet, and adherence to exercise and dieticians, if needed. Insofar as his work shift, that will need to be an agreement between the two of you. I only suggest that whatever shift he works, he must take his medication properly as well as plan his meals accordingly....

Munoz was informed that the JEC accommodation committee interpreted Dr. Chavez's letter to indicate that he could return to a rotating shift schedule as long as he was allowed to take his medication and meals regularly. Munoz claimed that Dr. Chavez did not intend to indicate that

---

§ 1630.2(j)(3)(i)), *aff'd* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

**59.** 42 U.S.C. § 12112(b)(5)(A).

**60.** *See, e.g., Templeton v. Neodata Services, Inc.,* 162 F.3d 617 (10th Cir.1998) (assessing employee's claim that employer failed to reasonably accommodate her).

**61.** *See* 29 C.F.R. § 1630.2(p)(1).

**62.** *See* 29 C.F.R. § 1630.9.

**63.** 42 U.S.C. § 12111(9).

he could go back on a rotating shift schedule, and was told by JEC that if further clarification was needed, Munoz needed to provide additional medical information for JEC to review. Munoz never contacted Dr. Chavez about clearing up any alleged misunderstanding about the doctor's recommendation. Because Munoz failed to establish that an accommodation was necessary, the Court concludes that JEC is also entitled to summary judgment on this issue.

### D. Constructive Discharge Claim.

To establish constructive discharge, Munoz must show that his employer's illegal discriminatory acts made working conditions so difficult that a reasonable person would feel compelled to resign.[64] This difficult standard requires that Munoz show he had "no other choice but to quit." [65]

Munoz concedes that while he was subjected to a hostile work environment based on his Mexican ancestry, "those conditions were not in and of themselves sufficient to force [him] to give up his employment." Rather, Munoz contends that it was JEC's refusal to accommodate his disability that compelled him to resign. As previously discussed, Munoz did not establish that he had a disability protected by the ADA, or that JEC failed to accommodate said alleged disability. The record indicates that although Munoz would continue on a rotating shift schedule, he would be allowed to take his medication and meals regularly. JEC gave Munoz the opportunity to provide further input from Dr. Chavez regarding the medical need for a fixed shift. For whatever reason, Munoz failed to contact Dr. Chavez or provide such information to JEC. No evidence indicates that Munoz was in a work environment that treated his health problems so poorly that a reasonable person would be compelled to resign. The Court grants summary judgment on this claim.

### IV. Conclusion.

Munoz fails to make a prima facie case on his disparate treatment claims. He fails to show a disability or failure to accommodate under the ADA and cannot establish a constructive discharge claim. Genuine issues of fact remain regarding the hostile work environment claim.

**IT IS THEREFORE ORDERED** that Defendant's motion for summary judgment (Doc. 28) is GRANTED with respect to the following claims:

1) Disparate treatment on the basis of national origin;

2) Failure to accommodate under the ADA; and

3) Constructive discharge.

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment is DENIED with respect to the hostile work environment claim.

IT IS SO ORDERED.

---

64. *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986).

65. *Woodward v. City of Worland*, 977 F.2d 1392, 1401 (10th Cir.1992), *cert. denied* 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993).